[No. S062670. July 20, 1998.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MELVIN RAY JONES et al., Real Parties in Interest.

668

**COUNSEL**

Gil Garcetti, District Attorney, Patrick D. Moran, Brentford J. Ferreira, Natasha S. Cooper and Shirley S. N. Sun, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Larry E. Williams, Ira B. Madison II, Franklin L. Ferguson, Jr., and Michael F. Yamamoto, under appointments by the Supreme Court, for Real Parties in Interest.

Steven J. Carroll, Public Defender (San Diego), Timothy A. Chandler, Alternate Deputy Public Defender (San Diego), Greg S. Maizlish, Deputy Public Defender, and Jacqueline C. Crowle, Alternate Deputy Public Defender, as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

MOSK, J.—In this matter, the Court of Appeal reversed a finding by the juvenile court that two 15-year-olds who killed a store owner during a robbery were fit and proper subjects for treatment under the juvenile court law.

Under Welfare and Institutions Code section 707, subdivision (e), the minors were presumptively unfit, but could overcome the presumption if they established fitness under each of five criteria: (A) the degree of criminal sophistication exhibited by the minor; (B) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (C) the minor's previous delinquency history; (D) the success of previous attempts by the juvenile court to rehabilitate the minor; and (E) the circumstances and gravity of the offenses alleged to have been committed.

The juvenile court concluded that the minors were fit and proper subjects for treatment under the juvenile court law under each of the criteria. The Court of Appeal reversed, holding the juvenile court abused its discretion in concluding that the minors were fit. We agree; the juvenile court's findings that the minors were fit as to the first and fifth statutory criteria, i.e., "the degree of criminal sophistication" and "the circumstances and gravity of the offenses alleged to have been committed," were not supported by substantial evidence. Accordingly, we affirm the judgment of the Court of Appeal.

I.

Melvin Ray Jones and Marcus Jones were 15 years old at the time of the incident giving rise to this proceeding. They are cousins; Marcus frequently stayed at Melvin's home. They attended Inglewood High School, where they earned acceptable grades; both participated in school and church activities. Neither had a history of criminal activity or gang affiliation.

On May 23, 1996, the minors left school to "eat lunch and get high." According to Melvin, they shared two quart bottles of fortified wine and

several marijuana cigarettes with two classmates before returning to school. After school, Melvin returned home to retrieve a gun he had "borrowed" from his friend John. He and Marcus then went to visit John and the boys consumed additional alcohol and marijuana. Later they shared a half-pint of vodka and smoked more marijuana cigarettes. John told Melvin to keep the gun until the next day. According to Marcus, he did not consume any drugs, but was intoxicated after he drank fortified wine and vodka.

About 6 or 7 p.m., after returning to Melvin's home, the minors continued a discussion they had begun earlier in the day about getting some money for the school prom by robbing someone. Melvin's father had limited his allowance, suspecting drug use, and refused to give him money to attend a school event. According to Melvin, he and his friends frequently talked about "jacking" someone for money. Melvin suggested a local market as their target, because "they could get away with it." Marcus was reluctant to join the plan, but did so because he was concerned for Melvin's safety. According to Marcus, the plan was to go into the store, "take down" whoever was in there, rush the cash register, "get what you got to get and leave."

They headed toward the store, stopping once or twice to vomit. The minors brought masks, apparently obtained from the school lost-and-found, and two gloves. Melvin checked the gun; he found that there was a bullet in the firing chamber. The gun was cocked. The minors attempted to uncock the gun and remove the bullet, so the gun would not discharge accidentally and hit one of them, but they were unable to do so.

The minors waited in an alcove near the store for customers to leave. Several neighborhood residents saw them; some recognized Melvin. Before entering the store, each minor put on a mask and a glove. Melvin took out the gun and entered the store first, and stood between the doorway and the front counter. The gun immediately fired into the face of the store owner, apparently at close range, killing him. The minors took money from the cash register, dropping all but a small amount, and ran from the store.

The minors fled to Melvin's apartment, discarding the masks, gloves, and gun along the way. They were pursued by police officers on the scene, who were alerted that someone had been shot. Although the minors reached the apartment, they did not have the key, apparently having lost it earlier in the day. They were arrested outside the apartment. The items dropped by the minors were subsequently located by the police, including the gun, which was found in the front yard of the house next door.

After they were detained, the minors were required to wait in the backseat of the police car for a field showup with several witnesses. Their conversation was recorded by a tape recorder left running by the police. In the course

of the conversation, they admitted the crime. Marcus stated that he "knew [he] shouldn't have did this shit" and that he was "faded." Melvin stated, "That's why I got hell fuckin' drunk." Melvin initially stated that he did not know why he shot the victim. Marcus asked him how it happened, observing that it was unprovoked: "Man how the fuck you pull the trigger on that nigger man? He didn't do nothing man." Melvin answered "I didn't even try to man, I don't mean it." Through the course of the conversation, he repeated that he "didn't mean it," and also stated: "I wouldn't have shot, man I was like fuck it. I just grabbed for the cash and ran." Marcus repeatedly expressed his desire to "run" and attempted to free himself from the handcuffs. He alternately blamed Melvin, stating "you shouldn't have fucked my life up like this," and wondered "who snitched on us." During the conversation, the minors also expressed fear and regret at the likelihood of imprisonment and the pain it would cause their parents.

On May 28, 1996, the People filed a petition as to each minor pursuant to Welfare and Institutions Code section 602, alleging murder and second degree robbery, plus personal use of a handgun, and concurrently, motions pursuant to Welfare and Institutions Code section 707, subdivision (d), to find the minors unfit subjects for treatment under the juvenile court law. The juvenile court ordered probation reports and evaluations by court-appointed psychologists.

The probation reports indicated that neither minor had a prior record and that their behavior was "out of character"; they had been behaving satisfactorily at home and in the community and were active in their church. The reports concluded, nonetheless, that the minors were unfit subjects for treatment under juvenile court law under the criterion of the degree of criminal sophistication because the offense was preplanned, the minors attempted to conceal their identities, and they used a handgun. The reports also concluded that the minors were unfit under the criterion of the circumstances and gravity of the offenses alleged, based on "[t]he fact that [they] did arm themselves with a handgun and did rob and murder the victim." On these grounds, the reports recommended that the minors be found unfit for treatment under the juvenile court law.

The psychiatric reports concluded that the minors were fit and proper subjects for treatment under the juvenile court law, despite the gravity of the crime, pointing, in particular, to their lack of previous criminal conduct, their intoxication, and their apparent lack of intent to kill.

The minors also submitted numerous letters from friends, teachers, and members of their church who described them as well-behaved, cooperative,

and likable. Detention reports submitted to the court described the minors as compliant and cooperative. The detention report on Melvin noted that he was "the best behaved minor in the unit"; the report on Marcus noted that he was a group leader in the juvenile hall program.

On January 10, 1997, fitness hearings commenced. The juvenile court permitted the fitness motion to be filed pursuant to Welfare and Institutions Code section 707, subdivision (e). The minors waived their right to a hearing under *Edsel P.* v. *Superior Court* (1985) 165 Cal.App.3d 763 [211 Cal.Rptr. 869]. The People conceded that the minors met several of the criteria for fitness—specifically that the minors could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, had no previous delinquent history, and had been subject to no previous attempts by the juvenile court at rehabilitation—but contended that they were unfit under the criteria of the degree of criminal sophistication and the circumstances and gravity of the offenses alleged.

The juvenile court found the minors fit and proper subjects for treatment under the juvenile court law under each of the criteria under Welfare and Institutions Code section 707, subdivision (e), and recited reasons for its findings.

As to the first criterion, the degree of criminal sophistication, the juvenile court explained its finding as follows. "There is a degree of sophistication, but neither of the minors is at the point where they are criminally sophisticated sufficiently to be unamenable." It observed that the term "criminal sophistication" applies to a minor who "through the commission of offenses over a period of time has developed a character of being highly complicated, mature in criminal activity and knowledgeable in those ways of plotting, planning and carrying out intricate criminal acts." It explained: "We are talking about degree of criminal sophistication to which the minor has developed . . . ." It concluded that use of a handgun "in and of itself does not show criminal sophistication." It found "no developing pattern of criminality or sophistication that could be attributed to these minors." It further observed, in substance, that the idea for the crime, and the manner in which the minors discussed it, was less an indication of criminal sophistication than a reflection of the ready influences of popular culture, including television, movies and rap music. Referring specifically to the use of "street slang" by the minors in their recorded conversation after the arrest, it stated: "They want to be accepted and they talk the talk, and they understand the language, and it's hip hop. . . . But that doesn't mean you're sophisticated." "This did not take a rocket scientist . . . What it did is it took, you know, thinking young men who for some reason or another thought that they could emulate

heroes—where they got them, I don't know—who were in the culture, who were in the street." Pointing to the statements by the minors that they "didn't mean to do it," it also stressed that the minors could not excuse their conduct after the fact: "It's too late. You can't undo it. You've done it. . . . Now you pay the consequences."

Addressing the specific crime, the juvenile court concluded that although it involved some planning, the robbery was not carried out in a criminally sophisticated manner. In this regard, it emphasized the minors' apparent lack of intent to shoot or hurt anyone; it also pointed to their blunders in executing the crime, including "not knowing how to work a gun," selecting a target close to home where they could be recognized, waiting undisguised outside the store, and losing the key to Melvin's apartment.

As to the second criterion, whether the minors could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the juvenile court observed that "the parties to the action here, in essence, have conceded that there is ample time in which each of these minors can be rehabilitated." It explained that under guidelines issued by the Youth Authority for the offense of first degree murder, the "baseline" is seven years, "which means that they will feel their program can rehabilitate a youngster within a 7 year period. [¶] The time we have in this situation is 10 years."

As to the third criterion, the minors' previous delinquent history, the juvenile court observed that they had none: "[N]either has a prior arrest, neither has been subject either formally or informally to the supervision of the court."

As to the fourth criterion, success of previous attempts by the juvenile court to rehabilitate the minors, it noted that "counsel have stipulated or in essence have agreed that this is not an issue, that there have been no previous attempts to rehabilitate the minors." It observed that, within the Youth Authority, "there are a number of programs, long term programs" to which they would be amenable.

As to the fifth criterion, the circumstances and gravity of the alleged offenses, the juvenile court observed that commission of the offense of murder was not, in itself, dispositive of the question whether a minor is fit. "It's patent that at no point in a fitness hearing is the minor required to establish innocence in order to show amenability to the juvenile court system." It opined that in evaluating the circumstances and gravity of the offenses alleged, it was not restricted to finding extenuating or mitigating circumstances, but could consider other statutory fitness factors and rehabilitative potential. It ruled that the minors carried their burden of establishing

that they were fit subjects for treatment under the juvenile court law. Specifically, it observed that, although the intoxication of the minors was not a defense to the crime, it was a circumstance that it could, and did, consider in evaluating fitness. It also considered the "ill-conceived and ill-acted out" nature of the crime. "It was sort of like the Three Stooges kind of thing. They did things that were just idiotic." It also considered that the minors did not intend to kill anyone and were sorry for their actions. In addition, it considered that the conduct was apparently "out of character" for them. Further, it considered the testimony of the psychiatric experts and the detention reports indicating that they were "accepting of the rehabilitative process" and "conducted themselves in an acceptable manner while detained."

The People sought a writ of mandate. The Court of Appeal concluded that the juvenile court abused its discretion in finding the minors fit and proper subjects for treatment under the juvenile court law under the criteria of degree of criminal sophistication and circumstances and gravity of the offenses alleged. As to the former criterion, it ruled that although the minors "may not have committed themselves to a criminal lifestyle," they were unfit because the crime was "carefully formulated." As to the latter criterion, it ruled that they were unfit because there were no mitigating or extenuating circumstances: "This was a senseless crime committed for the most petty of objectives. According to Melvin, he, Marcus and other friends 'frequently talked about "jacking" someone for money.' Although this may have been mere bragging, it is indicative of an attitude that robbery was a routine and acceptable means of getting that which they did not have. The minors had the opportunity to abandon their effort at several points beyond the planning stage, but failed to do so. This makes their crime all the more reprehensible." It caused a writ of mandate to issue, directing the juvenile court to vacate its order finding the minors fit and proper subjects for treatment under the juvenile court law, and to enter a new order finding them unfit under Welfare and Institutions Code section 707, subdivision (e).

We granted review.

## II.

Since 1976, minors who were 16 years old or older at the time they committed a crime can be tried as adults in the event they are not found fit and proper subjects under the juvenile law. (Welf. & Inst. Code, § 707, subds. (a)-(c).) Under these provisions, the seriousness of the alleged offense determines whether the minor is deemed presumptively fit or unfit for treatment as a juvenile. When we last addressed this statutory scheme, in *In*

*re Harris* (1993) 5 Cal.4th 813 [21 Cal.Rptr.2d 373, 855 P.2d 391], offenders younger than 16 could not be tried as adults in criminal court under any circumstances. The statutory scheme has subsequently undergone significant change: Effective January 1, 1995, offenders under the age of 16 are no longer immune from criminal prosecution, but are, under certain circumstances, presumptively unfit for trial as a juvenile.

As relevant here, Welfare and Institutions Code section 707, subdivision (e) (added by Stats. 1994, ch. 453, § 9.5), applies to cases in which a minor who "had attained the age of 14 years but had not attained the age of 16 years" is alleged to have committed the offense of murder under specific circumstances, including, as pertinent here, personally killing the victim or assisting any person to do so or, in the case of murder in the first degree, while not the actual killer, acting "with reckless indifference to human life and as a major participant in a felony enumerated in paragraph (17) of subdivision (a) of [Penal Code] Section 190.2." (Welf. & Inst. Code, § 707, subd. (e)(3).)

The statute requires that when the petitioner files an appropriate motion, the juvenile court "shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for a determination of unfitness. Following submission and consideration of the report, and of any other relevant evidence which the petitioner or the minor may wish to submit, the minor shall be presumed to be not a fit and proper subject to be dealt with under the juvenile court law unless the juvenile court concludes, based upon evidence, which evidence may be of extenuating or mitigating circumstances, that the minor would be amenable to the care, treatment, and training program available through the facilities of the juvenile court . . . ." (Welf. & Inst. Code, § 707, subd. (e).) Such a finding of fitness must be based on an evaluation of each of the following five criteria: "(A) The degree of criminal sophistication exhibited by the minor. [¶] (B) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. [¶] (C) The minor's previous delinquent history. [¶] (D) Success of previous attempts by the juvenile court to rehabilitate the minor. [¶] (E) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (*Ibid.*) If the juvenile court determines that the minor is fit, its findings must be "recited in the order as to each of the . . . criteria that the minor is fit and proper under each and every one of the . . . criteria. In making a finding of fitness, the court may consider extenuating or mitigating circumstances in evaluating each of the . . . criteria." (*Ibid.*)

Rule 1483(a) of the California Rules of Court requires that "[i]n a fitness hearing under section . . . 707(e), the child is presumed to be unfit, and the

burden of rebutting the presumption shall be on the child, by a preponderance of the evidence." Rule 1483(i) of the California Rules of Court authorizes review of a finding of fitness, in a hearing under Welfare and Institutions Code section 707, subdivision (e), by petition for writ of mandate by the People: "An order that a child is or is not a fit and proper subject to be dealt with under the juvenile court law is not an appealable order. Appellate review of the order is by extraordinary writ." Rule 1483(g) provides that "[i]f the prosecuting attorney indicates an intention to seek review of a finding of fitness, the court on request of the petitioner shall grant a continuance of the jurisdiction hearing . . . to allow time within which to obtain a stay of further proceedings from the reviewing judge or appellate court."

## A.

■ As a threshold matter, we address the question whether the People are entitled to appellate review, by extraordinary writ, of a finding of fitness. The answer is affirmative.

A juvenile court's fitness determination under Welfare and Institutions Code section 707, subdivision (e), is "not an appealable order" within the meaning of California Rules of Court, rule 1483(i), because no statute authorizing appeal of an adverse ruling by either the People or the minor exists. (See Welf. & Inst. Code, § 800 [appealable orders in wardship proceedings]; *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 713 [135 Cal.Rptr. 392, 557 P.2d 976].) The Courts of Appeal have long and consistently entertained petitions by the People to review error, pursuant to their original jurisdiction in proceedings for extraordinary relief. (See Cal. Const., art. VI, § 10; Code Civ. Proc., §§ 1085, 1086; *People* v. *Chi Ko Wong, supra,* 18 Cal.3d at p. 713 ["Our courts have long recognized the extraordinary writs of mandamus and/or prohibition as providing an avenue for immediate review of a juvenile court finding of unfitness . . . ."]; *People* v. *Superior Court (Rodrigo O.)* (1994) 22 Cal.App.4th 1297, 1302 [27 Cal.Rptr.2d 796] [listing cases].) That rule has been adopted in California Rules of Court, rule 1483(i), which specifically authorizes such review, and rule 1483(g), which provides for a continuance of the jurisdiction hearing if the prosecuting attorney intends to seek such review.

Minors contend that the People are entitled to challenge the juvenile court's ruling only to correct an action in "excess of jurisdiction." They rely for that proposition on dictum in *People* v. *Superior Court (James B.)* (1981) 122 Cal.App.3d 263 [175 Cal.Rptr. 733], wherein the Court of Appeal observed that mandate is not available to the People to correct " ' "ordinary

judicial error" [citation] or even "egregiously erroneous" orders' " but only to correct "an act in excess of jurisdiction," i.e., when the trial court "fell into more than ordinary judicial error" by issuing an order "directly contrary to the specific statutory procedure governing fitness hearings." (*Id.* at pp. 267, 268; see also *People* v. *Superior Court* (*Woodfin*) (1982) 129 Cal.App.3d 970, 975 [182 Cal.Rptr. 787] [State is entitled to writ relief from "an alleged unlawful attempt to *retain jurisdiction* by a juvenile court," (original italics), but not for "ordinary judicial error (such as abuse of discretion)."].)

Their reliance is misplaced. *James B.* drew a jurisdictional analogy to criminal proceedings, citing our decision in *People* v. *Superior Court* (*Stanley*) (1979) 24 Cal.3d 622, 625-626 [156 Cal.Rptr. 626, 596 P.2d 691]. (*People* v. *Superior Court* (*James B.*), *supra*, 122 Cal.App.3d at p. 268.) In *Stanley*, we observed, in connection with criminal proceedings, that "[i]f the prosecution has not been granted by statute a right to appeal, review of any alleged error may be sought by petition for writ of mandate *only* when a trial court has acted in excess of its jurisdiction and the need for such review outweighs the risk of harassment of the accused. [Citations.] Mandate is not available to the prosecution for review of 'ordinary judicial error' [citation] or even 'egregiously erroneous' orders [citations] when the order or ruling 'on its face is a timely exercise of a well-established statutory power of trial courts . . . from which no appeal is provided . . . .' [Citation.] Were the rule otherwise, ' "the People [would have] the very appeal which the Legislature has denied to them." ' " (24 Cal.3d at pp. 625-626, fn. omitted, original italics.)

We are unpersuaded that *Stanley* requires the conclusion that mandate is not available to the People for review of error by a juvenile court in a fitness proceeding. To the extent it may be understood to indicate otherwise, we disapprove the dictum in *James B.* Rather, we find such review a proper exercise of the writ.

Although error—whether "ordinary" or "egregious"—does not itself constitute action in "excess of jurisdiction" (see *People* v. *Superior Court* (1968) 69 Cal.2d 491, 501 [72 Cal.Rptr. 330, 446 P.2d 138]), it may result in a fitness order that incorrectly vests the juvenile court with jurisdiction, to the detriment of the best interests of the child, of the juvenile justice system, and of society. As the Court of Appeal reasoned in *People* v. *Superior Court* (*Steven S.*) (1981) 119 Cal.App.3d 162, 167 [173 Cal.Rptr. 788, 22 A.L.R.4th 1140]: "[R]eview of a finding of fitness is permitted to the People . . . prior to the commencement of the section 602 hearing in the juvenile court, for upon the commencement of the jurisdictional hearing, jeopardy attaches, and the order becomes insulated from further review."

Such writ review is also consistent with the requirement of Welfare and Institutions Code section 707, subdivision (e), that the juvenile court recite the reasons under each of its criteria for its ruling that a minor is *fit* for treatment under juvenile court law. The apparent legislative purpose for the requirement corresponds to what we have recognized as the purpose for the parallel requirement that the juvenile court state the reasons for ruling that a minor is *unfit* under the statutory criteria of Welfare and Institutions Code section 707, subdivision (a), i.e., to facilitate expeditious appellate review. (See *People* v. *Chi Ko Wong, supra,* 18 Cal.3d at p. 714, fn. 11; see also *People* v. *Superior Court (Robert L.)* (1989) 213 Cal.App.3d 54, 59-60 [261 Cal.Rptr. 303].)

We conclude, therefore, that in the case of an order finding a minor a fit subject for treatment under juvenile court law, and thereby vesting jurisdiction in the juvenile court, the People are entitled to seek writ review of error.

### B.

■ We next determine the applicable standard of review.

The trial court's ultimate finding of fitness or unfitness remains subject to review for error under an abuse of discretion standard. (See *People* v. *Chi Ko Wong, supra,* 18 Cal.3d at p. 718 [determination of fitness " 'may best be effectuated by the sound exercise of the juvenile court judge's discretion . . . .' "]; see also, e.g., *People* v. *Superior Court (Rodrigo O.), supra,* 22 Cal.App.4th at p. 1302 [noting that prosecutors' writ petitions at times have asserted that the juvenile court abused its discretion]; *People* v. *Superior Court (Zaharias M.)* (1993) 21 Cal.App.4th 302, 305, 308 [25 Cal.Rptr.2d 838] [holding that the juvenile court abused its discretion by failing to make specific findings as to each and every one of the criteria set forth in Welfare and Institutions Code section 707, subdivision (c)]; *People* v. *Superior Court (Robert L.), supra,* 213 Cal.App.3d at p. 61, fn. 5 [referring to abuse of discretion standard]; *People* v. *Superior Court (Steven S.), supra,* 119 Cal.App.3d at p. 172 [stating that the prosecutor's petition properly may assert that the juvenile court had abused its discretion].)

The findings required under the criteria listed in Welfare and Institutions Code section 707, subdivision (e), are evidently findings of fact.[1]

Accordingly, the minor charged with an offense subject to that provision must carry the burden of rebutting the presumption of unfitness under each

---

[1]Under the 1979 and 1994 amendments to Welfare and Institutions Code section 707, the juvenile court must treat the determination of fitness as predominantly factual. In this regard, the most significant changes were the amendment of Welfare and Institutions Code section 707 in 1979 to include a statutory presumption of unfitness when a minor, aged 16 years old

of the criteria "by a preponderance of the evidence." (Cal. Rules of Court, rule 1483(a).) Evidence Code section 606 requires that "[t]he effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (See *Edsel P.* v. *Superior Court, supra,* 165 Cal.App.3d 763, 776; *People* v. *Superior Court (Steven S.), supra,* 119 Cal.App.3d 162, 177 [Welfare and Institutions Code section 707, subdivision (c) "places upon the minor the burden of proof as to the nonexistence of the presumed fact [citation] and . . . the minor's burden of proof requires proof by a preponderance of the evidence."]; Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."].)[2]

Findings of fact are reviewed under a "substantial evidence" standard. (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) The standard is deferential: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], original italics.)[3]

Because Welfare and Institutions Code section 707, subdivision (e), requires a determination that the minor is unfit absent findings supporting fitness under *each* of the five factors, a determination of fitness resting on a finding unsupported by substantial evidence is necessarily an abuse of discretion. (See *Jimmy H.* v. *Superior Court* (1970) 3 Cal.3d 709, 715 [91

---

or older, is charged with specified offenses, and to require that the juvenile court determine, "based upon evidence," whether the minor is fit under each and every one of five separate criteria and recite its findings in the order. (*Id.,* subd. (c); Stats. 1979, ch. 1177, § 2, p. 4601.) Welfare and Institutions Code section 707, subdivision (e), added in 1994, extends the same requirements to minors between the ages of 14 and 16 alleged to have committed certain offenses of murder. (Stats. 1994, ch. 453, § 9.5.)

[2]Because a fitness hearing is not a criminal proceeding to determine the minor's guilt or innocence, the burden of proof for civil actions applies. (Evid. Code § 115; cf. *id.,* § 607 [governing the "[e]ffect of certain presumptions in a criminal action"].)

[3]As we explained in *People* v. *Bassett* (1968) 69 Cal.2d 122, 138-139 [70 Cal.Rptr. 193, 443 P.2d 777]: " 'The critical word in the definition is *"substantial"*; it is a door which can lead as readily to abuse as to practical or enlightened justice.' Seeking to determine the meaning of 'substantial' in this connection, the court in *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54], canvassed dictionary and judicial definitions and concluded that the term 'clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' " (Original italics.)

Cal.Rptr. 600, 478 P.2d 32] ["the sound discretion of the juvenile court" "must be exercised within the framework of the Juvenile Court Law," based on "substantial evidence adduced at the hearing"].) On review, the record must affirmatively demonstrate, based on the juvenile court's recitation of the various factors, that the minor has positively overcome the presumption of unfitness where a serious enumerated crime is alleged.

## C.

We now review the key requirements of Welfare and Institutions Code section 707, subdivision (e). As relevant here, several stand out as crucial. First, "the minor shall be presumed to be not a fit and proper subject to be dealt with under the juvenile court law . . . ." (Welf. & Inst. Code, § 707, subd. (e)(3).) Second, the minor can rebut the presumption and be determined fit if the court concludes that he or she would be amenable to treatment under the juvenile court law "under each and every one" of the five criteria set forth above. (*Ibid.*) Third, in making its determination of fitness, the juvenile court "may consider extenuating or mitigating circumstances" in evaluating each of the criteria. (*Ibid.*)

█ A minor charged with committing one of the specified offenses is not required to establish innocence in order to show amenability to the juvenile court system. "Whether the youth committed the act alleged in the petition is not the issue in [a fitness hearing]; the sole question is whether he would be amenable to treatment in the event that he is ultimately adjudged a ward of the court." (*People* v. *Chi Ko Wong, supra,* 18 Cal.3d at p. 716; see also *People* v. *Superior Court (Zaharias M.), supra,* 21 Cal.App.4th at p. 307.) Indeed, the criteria used to determine fitness are based on the premise that the minor did, in fact, commit the offense. (*People* v. *Superior Court (Rodrigo O.), supra,* 22 Cal.App.4th at pp. 1303-1304 [minor's evidence that he was elsewhere at the time of the crimes was not relevant to the determination of his fitness for treatment under the juvenile court law].) Instead, the minor may use the information contained in police reports, the probation report, expert evaluations, and other submissions to the court "to argue that his participation was not as grave or serious as the charge would initially lead a court to conclude." (*People* v. *Superior Court (Zaharias M.), supra,* 21 Cal.App.4th at p. 307.)

Nor does the fact that the minor committed one of the specified offenses automatically require a finding of unfitness. As the Court of Appeal stated in *Edsel P.* v. *Superior Court, supra,* 165 Cal.App.3d at page 777: "If we were to accept this reasoning, which we do not, all fitness hearings involving a minor charged with any of the offenses enumerated . . . would reach a

foregone conclusion and thereby be deprived of purpose. Such a result is impossible to reconcile with the language of [the statute], which clearly does not create a *mandatory* or *irrebuttable* presumption." (Original italics; see also *In re William M.* (1970) 3 Cal.3d 16, 30 [89 Cal.Rptr. 33, 473 P.2d 737] ["The nature of the charged offense cannot in itself constitute the basis for detention [of a juvenile]."].)

A finding of amenability must, however, be based on evidence and supported by findings addressed to each and every one of the criteria. Thus, the juvenile court may not find a minor fit as a general matter, after finding him unfit under even a single criterion. (See *People* v. *Superior Court (Zaharias M.), supra,* 21 Cal.App.4th at p. 306 [juvenile court erred in finding minor fit under "its own 'gestalt' approach" despite the lack of any extenuating or mitigating facts regarding the circumstances and gravity of the offense]; see also *People* v. *Superior Court (Steven S.), supra,* 119 Cal.App.3d at p. 187 [juvenile court erred in concluding that " 'the seriousness and gravity [of the offense] alone does not necessarily mean that the court must find that the juvenile is not a fit person for treatment in [a] juvenile facility.' [¶] . . . [T]he court must find the minor fit and proper under *each and every one of the criteria . . . ." (Original italics.)].)

### III.

■     Applying the foregoing requirements to the matter before us, the juvenile court erred, under an abuse of discretion standard, in determining that the minors were fit and proper subjects for treatment under the juvenile court law. We so hold based on our conclusion that its findings that they were fit under the criteria of the degree of criminal sophistication and the circumstances and gravity of the offenses alleged were not supported by substantial evidence.

In finding the minors fit under the criterion of the degree of criminal sophistication, the juvenile court observed that "there is some degree of sophistication," but concluded that "neither of the minors is at the point where they are criminally sophisticated sufficiently to be unamenable." It based its conclusion, inter alia, on the following considerations. The minors had no previous record of participation in any criminal offenses, gang activity, or mischievous conduct. Regarding the charged offense itself, the plan was uncomplicated and ineptly executed.

It erred thereby. The statute, in referring to "[t]he degree of criminal sophistication exhibited by the minor," requires a juvenile court evaluating this factor to consider the whole picture, that is, all the evidence that might

bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime. Here, the record shows that the juvenile court did consider both the minors' lack of previous criminality and the circumstances of the present offense, but determined that the ineptness of the minors in executing the offenses precluded a finding that they were "sophisticated." Its conclusion was not supported by substantial evidence.

Although the minors apparently had no history of prior delinquency, and the offense was apparently "out of character," their planning and execution of the robbery involved a degree of criminal sophistication precluding a finding of fitness. The minors planned the offense in considerable detail. They obtained a gun, masks, and gloves. They selected as their target a neighborhood store, because they believed they could "get away with it." It was their objective to "take down" whoever was in the store, rush the cash register and "get what you got to get and leave." Although they were subsequently arrested, in part through their own ineptness, they carried out their plan of "taking down" the only person in the store and removing money from the cash register before fleeing the scene. They had apparently planned an escape to Melvin's apartment. On their way there, to avoid detection, they disposed of evidence linking them to the offense. The fact that they were "inept" and did not elude arrest—e.g., that they were detected despite their use of masks and gloves, that they were unable to uncock the gun, that they lost the key to Melvin's house—does not constitute substantial evidence to support a finding that their conduct was "unsophisticated." The juvenile court's conclusion that the minors lacked "the slightest intent . . . to hurt or kill anyone" is belied by the highly dangerous manner in which they carried out the robbery. The juvenile court emphasized that the offenses "did not take a rocket scientist . . . a highly intellectual individual." Nor do most offenses, including "sophisticated" ones. In effect, the juvenile court improperly rewarded the minors for their miscalculations in carrying out a deliberate, well-planned robbery.

In finding the minors fit under the criterion of the circumstances and gravity of the offenses alleged, the juvenile court concluded that although the alleged offenses were "very serious," the circumstances surrounding the murder were sufficient to overcome the presumption of unfitness. It based its conclusion on the following considerations. The minors were intoxicated at the time of the robbery, they did not intend to hurt or kill anyone, and they were inept in carrying out the offense, particularly in mishandling the gun. It also considered their subsequent remorse and their cooperative behavior in detention.

Again it erred; the finding was not supported by substantial evidence of any mitigating or extenuating circumstance.

■ To overcome the presumption of unfitness under this criterion, the evidence supporting a juvenile court's findings must show that a minor's participation was not as grave or as serious as the charge itself would lead a court to believe. In evaluating the "circumstances and gravity of the crime," the juvenile court may consider any evidence regarding the mental state of the minor or the nature of the harm caused that, while not justifying or excusing the crime, tends to lessen its magnitude.[4]

■ In this instance, there is no doubt as to the gravity of the minors' offenses; an innocent person was killed by a gunshot to the face, at close range, in the course of a robbery carried out for the trivial purpose of obtaining money for a school prom. There is also no evidence of any extenuating and mitigating circumstances sufficient to support a finding of fitness.

Although the minors drank alcohol and may have used marijuana at various times during the day, they were not impaired to the extent of being unable to plan the robbery; indeed, they had apparently obtained the gun, masks, and gloves in advance and frequently talked about "jacking" someone for money. The offense does not appear to have been induced by intoxication; rather, the minors appear to have used alcohol, at least in part, for the purpose of fortifying themselves to carry out their plan. As Melvin explained: "That's why I got hell fuckin' drunk." Although the minors stated that they did not intend to kill or hurt anyone, Melvin brandished the gun in the victim's face, apparently at close range. They knew that the gun was loaded and cocked; indeed, they had earlier attempted to uncock the gun to avoid injury to themselves. After shooting their victim, they proceeded to grab money from the cash register and make their escape to Melvin's apartment, discarding the gun and the masks and gloves en route to avoid detection. Although some of the minors' blunders may have been "idiotic,"

[4]Welfare and Institutions Code section 707, subdivision (e), provides that the juvenile court's finding with respect to each factor must be "based on evidence, *which evidence may be of extenuating or mitigating circumstances.*" (Italics added.) The statute cannot properly be understood to permit a finding of fitness under the criterion of "circumstances and gravity of the crime" in the absence of any extenuating or mitigating circumstances; the minor, who bears the burden of overcoming the presumption of unfitness under this criterion precisely because he or she has been charged with the commission of a grave offense, can carry that burden only through a showing that the gravity was extenuated or mitigated by other attendant circumstances. (See *People* v. *Superior Court* (*Steven S.*), *supra*, 119 Cal.App.3d at p. 187 ["No evidence of 'extenuating or mitigating circumstances' having been produced to rebut the seriousness and gravity of the crime, the court was required, *under this criterion alone*, to make a finding of unfitness." (Original italics.)].) Nor can the statute properly be understood to permit the juvenile court to ignore extenuating or mitigating evidence in the record; otherwise, because the offense itself was grave, a minor could never be able to overcome the presumption of unfitness. (See *Edsel P.* v. *Superior Court, supra*, 165 Cal.App.3d at p. 777.)

the minors did not show that their participation was not as grave or serious as the charge would initially lead a court to conclude. Nor did the minors' subsequent remorse and good behavior, although clearly relevant to the question whether they could be rehabilitated prior to expiration of the juvenile court's jurisdiction, constitute extenuating or mitigating circumstances concerning the criterion at issue: the circumstances and gravity of the offenses alleged.[5]

## IV.

The Court of Appeal, in reversing the juvenile court finding, remanded with directions to set aside the finding of fitness and to instead find both minors unfit. We agree with that disposition. No juvenile court could reasonably conclude, based on all of the evidence presented, that these minors had overcome the presumption of unfitness under the criteria of criminal sophistication and circumstances and gravity of the offenses alleged. (See *People* v. *Superior Court (Rodrigo O.)*, *supra*, 22 Cal.App.4th at p. 1304 [Compelling juvenile court to vacate its order and enter an order finding the minor unfit: "Because insufficient evidence supports the court's findings as to each and every criterion, Rodrigo is unfit to be dealt with under juvenile court law."]; *People* v. *Superior Court (Steven S.)*, *supra*, 119 Cal.App.3d at p. 188 [Accord: "Upon evaluation of each and every one of the criteria . . . in light of the presumption, we must conclude that the evidence does not support the court's findings as to any one of the criteria."].)

For the foregoing reasons, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.,** Dissenting.—Clearly, on the facts of this case, one might disagree with the juvenile court that these minors were fit subjects for treatment in the juvenile justice system. Had I been the juvenile court judge, I might certainly have reached a different conclusion regarding their amenability to treatment and their fitness to remain in juvenile court. That,

---

[5]Contrary to the assertions of the dissenting opinion, we are not merely substituting our own judgment for that of the juvenile court. Nor do we "ignore" any evidence in the record. Rather, we hold that the juvenile court erred, under an abuse of discretion standard, because it failed to apply the specific standards set forth under Welfare and Institutions Code section 707, subdivision (e). In ruling the minors fit, it acted unreasonably. We disagree with the dissenting opinion that the minors' blunders mitigated the offense and that there was *substantial evidence* that they did not intend to kill: The action of holding a cocked gun to the face of their innocent victim speaks louder than any self-serving words, after the gun went off, to the effect that they did not "try to" or "mean it."

however, is *not* the question before this court. Instead, the question posed in this case is simply this: *Where does the primary responsibility for a juvenile fitness determination lie?* Is it in the trial court, in the exercise of its sound discretion based on substantial evidence, with deferential review by the appellate courts? Or is it in the trial court subject to independent review by the appellate courts?

Although the majority purports to follow the former, deferential standard of review, its actual resolution of the case cannot be reconciled with a deferential review standard. In holding the juvenile court's factual findings were unsupported by substantial evidence, the majority ignores contrary evidence in the record, fails to construe the record in a light most favorable to the party who prevailed below, and thereby deprives our trial judges of their traditional discretion to make a determination of suitability based on the facts and circumstances of each individual case, a determination trial judges, as experienced firsthand observers of the parties and all the circumstances, are best equipped to make.

The crime perpetrated by the two minors in this case was of the utmost seriousness. Were the perpetrators adults, society would rightly demand they be severely punished, possibly incarcerated for life. Because, however, they are juveniles, 15 years of age, society tempers its justifiable demand for punishment with a recognition that youthful characters are not always fully formed and that young people might make choices that are ill-considered, dangerous and sometimes even fatal. Our Legislature has created a statutory scheme that permits some, but not all, minors to be tried and punished as adults. In so doing, the Legislature has recognized that other of these young offenders—including even those who commit murder—can possibly be rehabilitated and eventually become law-abiding members of the community.

The decision whether a youthful criminal offender can likely be rehabilitated, or should instead be treated as an adult and subject to adult punishment, is often a difficult one. Although the Legislature has created a framework to guide the decisionmaking process, no set of rules in the abstract can appropriately resolve every individual case. Accordingly, the Legislature has entrusted our juvenile courts with the responsibility to make the initial decision, based on the facts laid out before them, whether a youthful offender is likely to be rehabilitated within the confines of the juvenile justice system. The law then requires appellate courts to defer to that decision, overturning it only when it determines the juvenile court has abused its discretion.

Because the majority, implicitly if not expressly, applies an improper standard of review, I dissent.

## I.

The facts are undisputed. Fifteen-year-old cousins Melvin and Marcus Jones performed acceptably in school and the community and were active in church. Short of cash for the school prom, they decided to obtain the necessary money by robbing a local store. They borrowed a gun from a friend and obtained masks and a pair of gloves from the high school lost-and-found. Seeking to increase their courage, they shared two quarts of Thunderbird wine and some vodka. They also smoked some marijuana. Finding a bullet in the firing chamber of the gun, they attempted, without success, to remove it so the weapon would not discharge accidentally. They cocked the hammer of the weapon, but could not figure out how to uncock it, leaving the hammer in the more dangerous, cocked position. As they headed to the store, they had to stop once or twice to vomit. They stood outside the store without their masks on and were recognized by passersby. Nevertheless, they proceeded to don their masks and enter the store, whereupon the gun, held by Melvin, immediately discharged in the face of the victim, Won Hee Lee, killing him. The minors fled, dropping most of the cash. They discarded the gun, gloves and masks as they ran to the safety of Melvin's apartment. Upon arrival, they found Melvin had lost the key to the apartment.

The police arrived and arrested the minors, placing them in the back of a police car, where they surreptitiously tape-recorded the minors' conversation. On the tape, the minors acknowledged they were drunk; Melvin asserted he did not try to kill the victim and that he did not mean to shoot. They expressed worry for what their parents would think of their arrest.

## II.

As the majority explains, the applicable law is set forth in Welfare and Institutions Code section 707, subdivision (e) (all further statutory references are to this code). It provides that for those minors, charged with murder, who have "attained the age of 14 years but [have] not attained the age of 16 years," "the minor shall be presumed to be not a fit and proper subject to be dealt with under the juvenile court law unless the juvenile court concludes, based upon evidence, . . . that the minor would be amenable to the care, treatment, and training program available through the facilities of the juvenile court . . . ." (§ 707, subd. (e).) The minor then bears the burden of rebutting the presumption of unfitness under five statutory criteria, and the juvenile court must find the minor fit under each one of the five criteria. These criteria are:

"(A) The degree of criminal sophistication exhibited by the minor.

"(B) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction.

"(C) The minor's previous delinquent history.

"(D) Success of previous attempts by the juvenile court to rehabilitate the minor.

"(E) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (*Ibid.*)

The juvenile court below found the minors were fit under criteria (B) through (D), as neither youth had had any previous contacts with the juvenile court. The People concede the minors are fit under those three criteria. The People argue, however, that the juvenile court's further ruling the minors were fit subjects for juvenile court treatment under criteria (A) and (E) was not supported by substantial evidence. The majority agrees. As I explain, the majority is incorrect.

As the majority acknowledges (maj. opn., *ante*, at p. 680), juvenile fitness determinations are subject to the *abuse of discretion* standard on appeal. (See *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 718 [135 Cal.Rptr. 392, 557 P.2d 976] [fitness determination committed to " 'the sound exercise of the juvenile court judge's discretion' "], disapproved on another point, *People* v. *Green* (1980) 27 Cal.3d 1, 34-35 [164 Cal.Rptr. 1, 609 P.2d 468]; *Jimmy H.* v. *Superior Court* (1970) 3 Cal.3d 709, 715 [91 Cal.Rptr. 600, 478 P.2d 32] [same]; *People* v. *Allgood* (1976) 54 Cal.App.3d 434, 447 [126 Cal.Rptr. 666] [same]; *People* v. *Joe T.* (1975) 48 Cal.App.3d 114, 119 [121 Cal.Rptr. 329] [same], overruled on another point, *People* v. *Chi Ko Wong, supra*, 18 Cal.3d at p. 713; *People* v. *Browning* (1975) 45 Cal.App.3d 125, 140 [119 Cal.Rptr. 420] [same], overruled on another point, *People* v. *Williams* (1976) 16 Cal.3d 663, 669 [128 Cal.Rptr. 888, 547 P.2d 1000]; see also *People* v. *Superior Court (Rodrigo O.)* (1994) 22 Cal.App.4th 1297, 1302 [27 Cal.Rptr.2d 796] [noting cases have described the standard of review as either an abuse of discretion or excess of jurisdiction]; *People* v. *Superior Court (Robert L.)* (1989) 213 Cal.App.3d 54, 61, fn. 5 [261 Cal.Rptr. 303] [assuming without deciding abuse of discretion standard applied].)[1]

To the extent a trial court is required to *find facts* in support of a legal ruling, such findings will be upheld on appeal if there is substantial evidence

[1]To be sure, none of the cited cases are directly on point, if for no other reason than the statutory scheme permitting children as young as 14 years old to be tried as adults in superior court has been in existence only since January 1, 1995. (Stats. 1994, ch. 453, § 9.5; see generally, *Hicks* v. *Superior Court* (1995) 36 Cal.App.4th 1649 [43 Cal.Rptr.2d 269] [discussing history of the law].) Although the primary authority for the abuse of discretion standard (*Jimmy H.* v. *Superior Court, supra*, 3 Cal.3d 709) was decided before the present

to support them. "Evidence, to be 'substantial' must be 'of ponderable legal significance[,] . . . reasonable in nature, credible, and of solid value.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) Because the trial court is present for testimony and the presentation of evidence, we defer to that court's determinations of fact, reversing them on appeal only where such findings are not supported by substantial evidence. This is so because "the appellate court has no opportunity to observe the appearance and general bearing of the witnesses, and is thus deprived of an important aid in the determination of the value and weight to be given the testimony." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 360, p. 411, italics omitted.)[2]

I agree with the majority that a juvenile court abuses its discretion if it finds a minor has rebutted the statutory presumption of unfitness when no substantial evidence supports that finding. (Maj. opn., *ante*, at p. 681; see *People* v. *Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79] [Where the trial court possesses discretion to choose between alternative legal outcomes, "exercise of that wide discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (Italics omitted.)]; *People* v. *Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171], quoting *People* v. *Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794] [" '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "]; see also *People* v. *Williams* (1998) 17 Cal.4th 148, 162 [69 Cal.Rptr.2d 917, 948 P.2d 429], quoting *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [discretionary decision must not " 'fall[] outside the bounds of reason' "].)

---

"presumption of unfitness" scheme was first enacted in 1976 to apply to 16- and 17-year-old offenders (Stats. 1976, ch. 1071, § 28.5, pp. 4825-4827), its holding has been since reiterated. (*People* v. *Chi Ko Wong*, *supra*, 18 Cal.3d at p. 718.) As the majority indicates, there is no serious doubt the proper standard of appellate review of juvenile fitness determinations is whether the juvenile court abused its discretion.

[2]The principle that appellate courts defer to credibility determinations made by the trier of fact is employed by appellate courts in a wide variety of settings. (See, e.g., *In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466], quoting *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435] [appellate court must give deference to factual findings of referee in habeas corpus reference proceeding because " 'referee had the opportunity to observe the demeanor of witnesses and their manner of testifying' "]; see also *People* v. *Turner* (1994) 8 Cal.4th 137, 205 [32 Cal.Rptr.2d 762, 878 P.2d 521] [trial court did not abuse discretion in excusing juror because "trial court was in the best position to observe his demeanor and assess his credibility"]; cf. *People* v. *Cudjo* (1993) 6 Cal.4th 585, 608 [25 Cal.Rptr.2d 390, 863 P.2d 635] [hearsay evidence generally excluded because, among other reasons, "the jury (or other trier of fact) is unable to observe the declarant's demeanor"].)

I part company with the majority, however, in its conclusion that in this case the juvenile court's factual findings lack the support of substantial evidence. (Maj. opn., *ante*, at pp. 683-686.) In evaluating the juvenile court's ruling for substantial evidence, we are required to view the evidence in a light most favorable to the minors, as the prevailing parties below. (*Gooch* v. *Hendrix* (1993) 5 Cal.4th 266, 279 [19 Cal.Rptr.2d 712, 851 P.2d 1321]; *People* v. *Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227 [69 Cal.Rptr.2d 380].) "When two or more inferences can reasonably be deduced from the facts, *the reviewing court has no authority to substitute its decision for that of the trial court.*" (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339], italics added.) We must assume the trial court resolved conflicts in the evidence in the minors' favor and accord the minors the benefit of all reasonable inferences raised by the evidence. (See generally, 9 Witkin, Cal. Procedure, *supra*, Appeal, § 359, pp. 408-409.)

The Court of Appeal in *In re Brittany H.* (1988) 198 Cal.App.3d 533 [243 Cal.Rptr. 763], a parental termination case, correctly summarized the applicable review standard: " 'A reviewing court must accept as true all evidence tending to establish the correctness of the findings of the trial judge. All conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment. It is well settled that whenever a finding or judgment of the trial court is attacked as being unsupported, the power of the reviewing court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted[,] which will support the conclusions reached by the trial court [citation]. All evidence most favorable to respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].' " (*Id.* at p. 549, quoting *In re Gano* (1958) 160 Cal.App.2d 700, 705 [325 P.2d 485].)

With these principles in mind, I turn to the merits of this case.

### III.

The critical inquiry concerns the first and fifth statutory criteria: "(A) The degree of criminal sophistication exhibited by the minor" and "(E) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (§ 707, subd. (e).)

## A. *Criminal Sophistication*

The juvenile court assessed the minors' criminal sophistication, concluding their relative lack of criminal sophistication indicated they were amenable to the care and treatment of the juvenile court. The court explained this was a first offense for both minors and their lives showed no pattern of criminality. Although the crime was planned, the number of blunders the minors made in its execution indicated they did not really know what they were doing. The court observed the minors, for example, did not even know how to uncock the hammer of the gun they used, a "[v]ery simple [procedure] if you know guns." In addition, the minors stood outside the store without their masks on, permitting them to be recognized by passersby. Even though the minors apparently knew they had been seen, they nevertheless continued into the store to commit the crime. Of critical importance, the court found the minors *did not intend to kill* the victim. The court found that, after the minors were arrested, they were very frightened of the situation in which they found themselves.

In conclusion, the juvenile court explained: "Everybody thinks they are going to go get away with it, and they don't. This [crime] did not take a rocket scientist . . . a highly intellectual individual. What it did is it took, you know, thinking young men who for some reason or another thought that they could . . . [¶] . . . make some money and not get caught, *without the slightest intent, I believe, according to the evidence that I heard, to hurt or kill anyone.* [¶] Taking into consideration all of those factors, there is a degree of sophistication. There is a degree of sophistication, but neither of the minors is at the point where they are criminally sophisticated sufficiently to be unamenable. And the court, therefore, as to Melvin and as to Marcus, taking into consideration the things that I have just discussed, both would be amenable under criteria number one." (Italics added.)

The majority concludes the juvenile court abused its discretion in finding the minors' lack of criminal sophistication was sufficient to rebut the presumption of unfitness, because its factual findings were not supported by substantial evidence. I cannot agree, for it cannot be said the juvenile court's decision was unsupported by evidence that was " 'reasonable in nature, credible, and of solid value.' " (*People* v. *Johnson, supra*, 26 Cal.3d at p. 576, quoting *Estate of Teed, supra*, 112 Cal.App.2d at p. 644.)

Undeniably, *one* reasonable view of the evidence is that the minors' blunders in effectuating the crime do not indicate a lack of sophistication, given their advance planning, use of a firearm, and earlier planning activity in obtaining gloves and masks, and, further, that in view of their brandishing

of the cocked gun, the minors intended to kill. This, indeed, is the interpretation of the evidence the majority adopts; it contends "[t]he fact that [the minors] were 'inept' and did not elude arrest . . . does not constitute substantial evidence to support a finding that their conduct was 'unsophisticated.' The juvenile court's conclusion that the minors lacked 'the slightest intent . . . to hurt or kill anyone' is belied by the highly dangerous manner in which they carried out the robbery." (Maj. opn., *ante*, at p. 684.) This view is also consistent with the probation report prepared for both minors.

Where the majority goes astray is in its refusal to recognize that this is not the *only* reasonable interpretation of the facts. The juvenile court below concluded the minors' lack of any criminal record, blunders in the commission of the crime and evident lack of intent to kill indicated their relative degree of criminal sophistication was insufficient to indicate an unfitness to remain in juvenile court. In reaching that conclusion, the juvenile court did not, as the majority finds, rely on evidence so ephemeral or insubstantial that an appellate court should decline to accord the conclusion the traditional deference given to factual findings made by the trier of fact.

On the question of whether the blunders committed by the minors in the commission of the crime reasonably could be construed as failing to demonstrate a sufficiently high level of criminal sophistication so as to preclude retention in the juvenile justice system, I quote the psychological report of Dr. Clive Kennedy, prepared after his examination of Melvin:

"[Melvin's] behavior and recent past do not meet the criteria for a moderate or severe conduct disorder. *This suggests that the minor's behavior is not consistent with that of sophisticated juvenile delinquents.* He does not affiliate with an organized gang or criminal group. He does not engage in firesetting, routinely initiate fights using weapons, or violate the rights of others with confrontation. [¶] The present crime[,] however, does have sophisticated elements. He used a handgun and mask. However, his choice of a target near his home (where he was identified), decision to become intoxicated prior to participating in the crime, and his mode of escape (no vehicle was used) shows poor planning, were less sophisticated, and may have contributed to his capture. The mask was not effective as the minor was identified as he left the store. And the gun appeared to be 'borrowed' from a classmate, another potential source of capture. *Therefore, the facts of this case alone, are not sufficiently compelling to indicate[] a lack of amenability.* Again, the fact that these behaviors appear to be inconsistent with his customary lifestyle does argue for amenability. He is considered fit under this criteria." (Italics added.)

The court considered the minors' lack of any prior contacts with the juvenile justice system and that their crime was inconsistent with their

character.[3] The court also read and considered the behavioral studies, including the one quoted above from Dr. Kennedy, which concluded specifically that Melvin's lack of criminal sophistication rendered him amenable to treatment. (A different study of Marcus, prepared by Dr. Jack Rothberg, was not so specific, but did conclude overall that he was amenable to treatment.)

By no stretch of the imagination can one legitimately characterize this evidence as "insubstantial" and therefore deserving of no deference. That I, like the majority, might disagree with the trial court and draw different inferences from the evidence, is of no consequence. Our role is not to try the case de novo, nor do we exercise independent review. When, as here, two reasonable views of the evidence are possible, proper appellate procedure requires that we view the evidence in a light favorable to the minors, as the parties who prevailed below, and defer to the juvenile court's interpretation of the significance of the blunders they committed in execution of their planned robbery.

The proper inference to be drawn from the blunders aside, the juvenile court found the minors did not intend to kill; this fact alone, if supported by substantial evidence, supports the juvenile court's conclusion the minors were insufficiently sophisticated to be unamenable to rehabilitation. Indeed, both common law and statutory law recognize that a lack of intent to kill is the single most powerful circumstance that can mitigate a homicide. On this point, the juvenile court considered carefully the minors' recorded statements in the back of the police car. At one point, Marcus states: "Man how the fuck you pull the trigger on that nigger man? He didn't do nothing man." Melvin replied: "*I didn't even try to man, I don't mean it.*" (Italics added.) Although the juvenile court could reasonably have disbelieved these statements as self-serving, the court instead decided the statements were credible. Speaking of Melvin, who apparently was holding the weapon when it discharged, the court stated: "There was [an] indication that he did not know how to work the gun, did not know how to uncock it. The sole purpose of the weapon was to rob the store, but *there was no intent to kill.*" (Italics added.) Later: "The court didn't find in any of the material or evidence that was presented to it that the minors contemplated killing anyone. There was not an attempt to do so."

---

[3]The majority's attempt to diminish these factors by stating "the minors *apparently* had no history of prior delinquency, and the offense was *apparently* 'out of character' " (maj. opn., *ante,* at p. 684, italics added) fails. As even the majority admits, "[t]he probation reports indicated that neither minor had a prior record and that their behavior was 'out of character.' " (*Id.* at p. 673; see also *id.* at p. 673 ["psychiatric reports concluded that the minors were fit . . . pointing . . . to their lack of previous criminal conduct"].) That the crime was out of character is underscored by the numerous letters in the record in support of the minors written by family and friends.

Considering that the minors did not know they were being recorded in the police car and, thus, were more likely to be speaking the truth, the juvenile court's conclusion the minors lacked the intent to kill was not unreasonable. Faced with disputed facts, the juvenile court simply made a commonplace credibility determination. The juvenile court personally heard the witnesses testify, personally observed the minors and was able personally to evaluate their demeanor, all factfinding advantages not shared by myself or my colleagues in the majority. To the extent the majority chooses to disregard or disbelieve this evidence, they simply are substituting their own credibility determination for that of the juvenile court. To do so, of course, is improper.

In addition to the minors' statements, support for the juvenile court's conclusion they did not intend to kill is found in the minors' behavioral studies. Dr. Kennedy's study of Melvin notes "information from [the minor's] interview and police reports indicates that the shooting was not planned." Dr. Rothberg's study of Marcus notes Marcus "insists that he had no intention of ever hurting anyone." The majority apparently disregards this evidence as well.

In short, not just substantial, but ample, evidence supports the juvenile court's findings of fact concerning "[t]he degree of criminal sophistication exhibited by the minor[s]." Hence, the court did not abuse its discretion in finding the minors had rebutted the presumption of unfitness under section 707, subdivision (e), criteria (A).

### B. *Circumstances and Gravity of the Offense*

The juvenile court also found the minors had rebutted the presumption of unfitness regarding the fifth statutory criteria: "The circumstances and gravity of the offense[] . . . ." (§ 707, subd. (e), criteria (E).) The charged crime—murder—is, of course, extremely serious. The statutory presumption of unfitness, however, *presupposes* the crime will be at least this serious, for a 15-year-old cannot be tried as an adult unless at the threshold he or she is charged with murder. By requiring that a minor rebut the presumption of unfitness by showing amenability, after an evaluation of the circumstances and gravity of the offense, the Legislature must have intended something over and above the mere fact the People allege the minor committed a murder.

I have already explained that substantial evidence supports the juvenile court's determination the minors lacked the intent to kill. Their lack of intent alone constitutes sufficient mitigation of the "circumstances and gravity of the offense[]" (§ 707, subd. (e), criteria (E)) to uphold the juvenile court's

decision concerning mitigation. There was, however, more. The juvenile court found intoxication played a large part in the crime. This conclusion is supported by the statements of the minors themselves (they regarded themselves as "faded") as well as by the behavioral studies. Dr. Kennedy's study reported "both minors repeatedly ingested large quantities of [alcohol and marijuana] prior to the incident" and concluded Melvin was a fit subject for the juvenile court under section 707, subdivision (e), criteria (E). Dr. Rothberg also concluded Marcus "drank a substantial quantity of the alcohol, and [was] intoxicated." There was no real factual dispute the minors were intoxicated at the time of the crime.

The majority misconstrues the import of this evidence, reasoning the evidence suggests the minors were not so intoxicated that they were unable to form the intent to plan the robbery and that their intoxication was merely to fortify themselves for the difficult task ahead. Perhaps so. These circumstances, however, cast no serious doubt on the juvenile court's finding that the minors' state of intoxication diminished to some extent their impulse control and sense of right and wrong. Stated differently, the minors' state of intoxication at the time of the crime *mitigated* the "circumstances and gravity of the offense[]." (§ 707, subd. (e), criteria (E).)[4]

To the extent, moreover, that the majority simply emphasizes inferences regarding the minors' intoxication different from those drawn by the juvenile court, the majority might do well to heed its own cited authority: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, <u>contradicted or uncontradicted</u>, which will support the determination . . . ." (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], original italics, underscoring added, also quoted at maj. opn., *ante*, at p. 681.) In other words, mere contradictions in the evidence are insufficient to overturn a factual finding by the trier of fact.

There being substantial evidence supporting the juvenile court's findings that the minors' lack of intent to kill and intoxication at the time of the crime mitigated the "circumstances and gravity of the offense[]" so as to render them amenable to the care and treatment of the juvenile justice system, the juvenile court did not abuse its broad discretion in finding the minors had rebutted the presumption of unfitness under section 707, subdivision (e), criteria (E).

---

[4]Of course, intoxication can constitute a circumstance in mitigation relevant to a juvenile fitness determination even if it does not rise to the level of an actual defense to the charged crime.

## IV.

Although the majority purports to apply the substantial evidence test, which is a deferential standard of appellate review, it instead merely substitutes its own view of the evidence. The danger of this approach is greater than any potential harm to these two adolescents. Although ample evidence supports the juvenile court's exercise of discretion, the majority fails to show appropriate deference to that court's decision. This sends to our lower appellate courts the unfortunate message that, although we *say* appellate courts should show deference to a trial court's decision on a minor's fitness to remain in juvenile court, what we apparently *mean* is that appellate courts should reweigh the evidence, decline to construe the juvenile court's findings of fact in a light favorable to the party who prevailed below, make de novo credibility determinations based on the appellate record and reach an ultimate decision preferred by the appellate court. The majority's ad hoc approach is not only a departure from past practice, it also has the unfortunate by-product of encouraging unnecessary litigation, for without appellate deference to the trial court's factual decisions, a losing party has a much greater incentive to seek appellate review, seeking a second bite of the apple. Such a scheme ignores the basic function of our trial courts and the historic role of the appellate courts and threatens to add to an already overburdened appellate caseload.

I dissent.